# In The United States Court of Appeals
# For The Eighth Circuit

United States of America

Appellee,

vs.

Tou Thao

Appellant.

On Appeal from the United States District Court
For the District of Minnesota

## APPELLANT TOU THAO'S OPENING BRIEF

**Robert M. Paule**
Robert M. Paule, P.A.
920 Second Avenue South
Suite 975
Minneapolis, MN 55402
(612) 332-1733

**Natalie R. Paule**
Paule Law P.L.L.C.
101 East Fifth Street
Suite 1500
St. Paul, MN 55104
(612) 440-3404

*Counsel for Appellant Tou Thao*

## SUMMARY OF THE CASE

Appellant, Tou Thao, appeals his convictions by jury trial for Count Two – Deprivation of Rights Under Color of Law - Failure to Intervene in violation of 18 U.S.C. Section 242 and Count Three – Deliberate Indifference in violation of 18 U.S.C. Section 242.

Thao was convicted of two counts of Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242. R. Doc. 1; Addendum at 1; R. Doc. 281; Addendum at 5. Specifically, Thao was convicted of willfully failing to stop Derek Chauvin's use of unreasonable force and willfully failing to aid George Floyd, "thereby acting with deliberate indifference to a substantial risk of harm to Floyd" which resulted in Floyd's death. R. Doc. 281; Addendum at 5. The district court sentenced Thao to forty two (42) months of imprisonment on each count to be served concurrently. R. Doc. 465; Addendum at 18.

Thao appeals his criminal conviction on two grounds: (1) prosecutorial misconduct, and (2) sufficiency of evidence. Thao's conviction should be overturned because (1) the prosecution's remarks and conduct were improper and prejudicially affected Thao's substantial rights and acted to deprive him of a fair trial, and (2) no reasonable jury could have found Thao guilty beyond a reasonable doubt because there was not a sufficiency of evidence as to the requisite *mens rea*.

Thao requests 15 minutes per side for oral argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Concerning Oral Arguments……………....…ii

Table of Contents…………………………………………………………………..iii

Table of Authorities…………………………………………………………..…….vi

Jurisdictional Statement………………………………………………………...…..1

Statement of Issues ……………………………………………………………..…2

Statement of the Case…………………………...…………………………………..3

A. Factual Background ……………………………………………………………..3

   1.  MPD Training ………………………………………………………….....3

   2.  Offense conduct……………………………………………………………12

         i.  Evidence regarding Thao's willfulness………………………22

B. Prosecutorial Remarks and Conduct……………………………………………24

   1.  Unfairly duplicative evidence and cumulative testimony………………..25

   2.  Violations of pretrial orders………………………………………………27

      a.  For eliciting emotional responses…………………………………27

      b.  For speculation……………………………………………………28

   3.  Inappropriate arguments …………………………………………………29

      a.  Argumentative opening…………………………………………...29

      b.  Argumentative with Defendant Thao……………………………..29

      c.  Improper Closing Argument………………………………………29

      d.  Unprofessional remarks in front of the jury…………………………30

Standard of Review……………………………………...………………………...31

Summary of the Argument…………………………………...……………………32

Argument…………………………………………………………………………33

   I.    Conviction Should be Overturned Because of Insufficiency of Evidence……………………………………………………………....33

       A. Standard of review…………………………………………………..33

       B. Viewing the evidence in the light most favorable to the guilty verdict, no reasonable jury could have found Thao guilty beyond a reasonable doubt …………………………………………………………..33

          a.  There is an insufficiency of evidence as to the requisite *mens rea* of willfulness…………………………………………..33

   II.   Conviction Should be Overturned Because of Prosecutorial Misconduct…………………………………………….…...………...37

        A. Standard of review……………………………………………………37

        B. The prosecution's remarks and conduct were improper…………...37

        C. The prosecution's improper remarks and conduct prejudicially affected Thao's substantial rights so as to deprive him of a fair trial………………………………………….……………...41

CONCLUSION………………………...………………………………………44

Certificate of Service………………………...…………………………………45

Certificate of Compliance with FRAP 32(a)(7)(C)…………………………………46

Certificate of Virus Check…………………………………………………………...47

ADDENDUM………………………………………………………………………..48

    A. Table of Contents……………………………………………………………..49

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Berger v. United States,* 295 U.S. 78,79, 55 S.Ct. 629,

79 L.Ed. 1314 (1935)……………………………………………………………..42

*Carlson v. Minnesota,* 945 F.2d 1026, 1029 (8th Cir.1991))……………....2, 31, 37

*Graham v. Connor,* 490 U.S. 386 (1989)………………………………………29

*United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011)…………...2, 31, 37

*United States v. Conrad,* 320 F.3d 851, 855 (8th Cir. 2003)…………………42, 43

*United States v. Eldridge,* 984 F.2d 943, 946-47 (8th Cir. 1993)…………………41

*United States v. Hernandez,* 779 F.2d 456 (8th Cir. 1985)……………2, 31, 37, 41

*United States v. King,* 616 F.2d 1034, 1040 (8th Cir.), cert. denied, 446 U.S. 969,
100 S.Ct. 2950, 64 L.Ed.2d 829 (1980)………………………………………...43

*United States v. Norton,* 639 F.2d 427, 429 (8th Cir. 1981)………………………42

*United States v. Sullivan,* 714 F3d. 1104 (8th Cir. 2013)…………………..2, 31, 33

*United States v. Wells,* 706 F.3d 908 (8th Cit. 2013). ………………..……2, 31, 33


**Statutes**                                                                                               **Page(s)**

18 U.S.C. § 242…………………………………………………………….*passim*

# JURISDICTIONAL STATEMENT

This is a direct appeal from a sentence and judgement of the United States District Court for the District of Minnesota, Honorable Paul A. Magnuson entered on July 27, 2022. The Sentence and Judgement appealed from involves a conviction after a jury trial of two counts of Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242.

On February 24, 2022, Thao was found guilty of Count Two – Deprivation of Rights Under Color of Law – Failure to Intervene in violation of 18 U.S.C. § 242 and Count Three – Deprivation of Rights Under Color of Law – Deliberate Indifference in violation of 18 U.S.C. § 242. R. Doc. 281. On July 27, 2022, Thao was sentenced to a term of imprisonment of 42 months for each count to be served concurrently and two years of supervised release for each count to be served concurrently. R. Doc. 465.

A timely notice of appeal was filed by counsel on August 10, 2022. R. Doc. 488. Appellant invokes this Honorable Court's jurisdiction pursuant to 28 U.S.C. 1291, which confers jurisdiction upon the court of appeals from all final decisions of the district court. The judgement and sentenced was imposed by the United States District Court for the District of Minnesota, which is located within the jurisdiction of the United States Court of Appeals for the Eighth Circuit 28 U.S.C. § 41.

# STATEMENT OF ISSUES

1) Viewing the evidence in the light most favorable to a guilty verdict and granting all reasonable inferences that are supported by evidence, no reasonable jury could have found Thao guilty beyond a reasonable doubt because there is insufficiency as to the requisite *mens rea.*

   **Apposite Authorities:** *United States v. Sullivan,* 714 F3d. 1104 (8th Cir. 2013); *United States v. Wells,* 706 F.3d 908 (8th Cit. 2013).

2) The prosecution's remarks and conduct were improper. The improper remarks and conduct by the prosecution affected Thao's substantial rights and deprived him of a fair trial.

   **Apposite Authorities:** *United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011); *Carlson v. Minnesota,* 945 F.2d 1026, 1029 (8th Cir.1991); *United States v. Hernandez,* 779 F.2d 456 (8th Cir. 1985).

**STATEMENT OF THE CASE**

**A. Factual background**

Thao was charged in a three-count indictment, which had two counts as to him: (a) Count Two: Deprivation of Rights Under Color of Law – Failure to Intervene in violation of 18 U.S.C. § 242 and (b) Count Three: Deprivation of Rights Under Color of Law – Deliberate indifference in violation of 18 U.S.C. § 242. He was found guilty of the two counts after a jury trial and sentenced to 42 months of imprisonment on each count to be served concurrently.

**1. MPD Training**

Thao attended the Minneapolis Police Department ("MPD" herein) academy located at the Special Operations Center in North Minneapolis. Transcript at 3057. The recruits also were taken at times to Fort Snelling to train. *Id.* At that time in 2009, the academy was roughly six months. *Id.*

Days in the academy would start at 8:00 a.m. *Id.* at 3058. The recruits went through daily defensive tactics as well as physical training. *Id.* They were trained on MPD policies and applicable law. *Id.* Daily defense tactics classes trained a set of skills that involved handcuffing, takedowns, and other use of force techniques, including the use of Tasers and batons. *Id.* at 3058-59. Photographs documented these specific trainings. *See* Thao Ex. T-27A through T-27T.

3

MPD consistently trained its officers to restrain people in the prone position using their body weight, specifically including the use of putting a knee on the neck/upper back of the person being restrained. This is specifically and consistently demonstrated by Thao's academy photographs from 2009, the 2017 MPD Academy Restraint Videos, and the Excited Delirium PowerPoint (which was used until 2021 both in the academy and in in-service training). *See* Thao Ex. T-12; Thao Ex. T-20; Thao Exhibit T-21; Thao Exhibit T-22; and Thao Exhibits T-27A through T-27T. Of note are photographs showing MPD use of force trainers encouraging, observing, and at times smiling down at recruits pinning down pretend arrestees handcuffed in the prone position – at times with their knees on the back of the arrestee's neck and head. Thao Ex. T-27A; Thao Ex. T-27B; Thao Ex. T-27C (showing a use of force instructor smiling down while a recruit has his left knee on the neck of a handcuffed person); Thao Ex. T-27D (Showing a use of force instructor's feet pointing towards Thao and a female recruit. Thao and the other recruit are being trained and observed on how to restrain a person in the prone position using their body weight and knees. Two use of force instructors are observing in the backgrounds); Thao Ex. T-27E (Showing Thao in the MPD  academy being trained to restrain an arrestee in the prone position with his knee on the person's buttock while the other recruit has her knee on or about the arrestee's neck; and Thao Ex. T-27O (This is not Thao, but another recruit. The recruit is using his knee on a person's neck to hold them in the prone position. In the background is a use of force instructor with a clipboard observing).

Another photograph from his academy days shows a training officer of the academy had displayed some of these prone restraint teaching photographs proudly on her bulletin board. Thao Ex. T-27S. When zoomed in, one can see that this instructor had displayed the above photographs of MPD academy recruits using their knees on necks. For instance, the second to the top photograph on the first column is Thao Ex. T-27O.

Thao testified that the photographs show the fake-arrestees wearing protective headgear (with a hard plate covering the back of the volunteer's neck), confirming that (1) MPD academy trained recruits to use body weight and knees on the neck and head while handcuffing and restraining people in the prone position, and that (2) the MPD knew it had to protect the fake-arrestee's head and neck from injury during this specific training. *See* Tr. 14 at 3066.

The MPD trained its academy recruits to use knees on the back of necks when arresting. *See* Thao Ex. T-20, T-21, and T22. Thao Ex. T-21 is particularly telling. It shows recruits repeatedly pinning arrestees down using their knees on their neck while use of force officers smile and giggle.

Thao and his fellow recruits were trained to place arrestees in the prone position while handcuffed. They were trained to place their knees on the person's body and shift their body weight to control them. Tr. at 3078-79; and 3083. Instructors never corrected that this was an improper technique. *Id.* at 3084. Quite the opposite: instructors showed

Thao and other recruits how to use their legs around the neck of a person to restrain them, but recruits were never allowed to practice the moves themselves. *Id.* at 3085.

The academy at that time trained in a militarized way, having recruits dress the same (Thao Ex. T-27G), running in formations while singing military cadences (*id.;* Thao Ex. T28), dressed in full military gear complete with gas masks and batons (Thao Ex. T-27I, T27J); and recruits trained to answer with "yes, sir; no, sir; yes. ma'am; no ma'am" (Tr. at 3072). Most revealing is a photograph of the MPD academy class in gas masks and batons in a v-formation with smoke around them with the caption "THE POPO. Go ahead, pick up that rock…" Thao Ex. T-27-T.

The MPD trained Thao and his fellow recruits about a phenomenon called "excited delirium syndrome". Tr. at 3099. The MPD's lessons on excited delirium contained a PowerPoint presentation that was used to train the recruits, including Thao during his time at the academy. *Id.* at 3099-3100; Thao Ex. T-12.

 Thao graduated from the academy in 2009, but the MPD laid his entire class off due to budgetary reasons. Tr. at 3057 and 3091. In 2011, the City of Minneapolis recalled Thao's graduating class back as MPD police officers. *See* Tr. at 3104-3105. Thao and other officers recalled off the waiting list "went through a one-month process to get updated on department policies, law, and get recertified up to POST requirements." *Id.* at 3105.

Subsequently, Thao completed the field training program (a.k.a. "FTO") *Id.* at 3106. The field training program lasted about five to six months and encompassed a recruit riding

along with a veteran officer who was tasked with training them. *Id.* 3106. As the program wore on, rookie officers would gain more responsibilities on the calls. *Id.* at 3107.

After completing the FTO program. Thao was assigned to the Third Precinct. *Id.* at 3108. Thao remained assigned to the Third Precinct until May 25, 2020 *Id.* at 3108-9.

MPD officers receive annual in-service training refreshers. Tr. at 3165. In-service included topics such as CPR training and defensive tactics. *Id.*

During the in-service training, instructors taught MPD policy that allowed for the use of leg restraints and showed the officers how to use their legs to cut off the blood flow of an arrestee's arteries. *Id.* at 3084.

Thao was trained on the use of the hobble restraint. Tr. at 3130-31. When a hobble is used on a handcuffed individual, "[y]ou may have to tie his ankle and then bring it up behind him into one of the belt loops of the pants; or if there's none, then you might have to use a handcuff." *Id.* When a hobble – also known as an MRT or Maximum Restraint Technique – is used, officers are trained that the arrestee must be rolled onto their shoulder and a sergeant is notified. *Id.* at 3134. A sergeant must respond to the scene and take photographs of the hobble to insure the officers applied it correctly before the arrestee can be transported. *Id.*

During his tenure as an MPD officer, Thao had interactions with people he believed met the criteria for excited delirium. *Id.* at 3139. He estimated – conservatively – he encountered 30 people who met the criteria on with MPD trained him to suspect excited

delirium. *Id.* During those encounters, the person believed to be experiencing excited delirium was restrained until paramedics arrived, then the paramedics would handcuff them to the gurney and sedate them. *Id.* at 3139-40.

Thao was trained in basic first aid, including CPR. Tr. at 3145; 3163. The MPD trains officers to immediately start CPR if a person has no pulse. *Id.* at 3149.

The MPD taught their recruits about the phenomenon known as "excited delirium" while training the recruits at the academy and also retraining them about it throughout the in-service training. At the academy, the MPD taught ExD through the use of a PowerPoint. Tr. at 3099; Thao Ex. T-12. Additionally, the in-service training consisted of more ExD PowerPoints that contained much of the same information and videos. Tr. at 3100.

Inspector Katie Blackwell testified to the MPD training on excited delirium at the federal trial. Specifically:

- MPD trains its officers on excited delirium during the academy and during in-service training. Tr. at 1224 and 1216.

- MPD regularly trained its officers to be aware of excited delirium, how to recognize excited delirium, and how to respond to it as an officer. Tr. at 1217.

- Thao went through an in-service training on excited delirium in 2019. *See* Tr. at 1227-1228. This excited delirium training included the PowerPoint labeled as Thao Ex. T-12. *See* Blackwell testimony at Tr. at 1228-1229 (note: the PowerPoint was often mistakenly referred to as Exhibit T-13).

- MPD trained its officers that excited delirium is "a condition that manifests as a combination of delirium, psychomotor agitation, anxiety, hallucinations, speech disturbances, disorientation, violent and bizarre behavior, insensitivity to pain, elevated body temperature and super-human strength." Tr. at 1234.

- MPD trained its officers that when dealing with a person experiencing excited delirium person, "Law enforcement control measures should be combined with immediate sedative and medical intervention to attempt to reduce the risk of death." Tr. at 1265;

  - Thao was specifically taught through the use of the ExD Power Point. Thao Ex. T-12 at Slide 34.

- Blackwell agreed that "the police restraint is actually a means of protecting [excited delirium] people from exhausting themselves and dying", and that the point of the PowerPoint is to train them on this point. Tr. at 1265.

- MPD trained its officers to restrain people thought to be experiencing excited delirium until they can be sedated by EMS. Tr. at 1266.

- MPD trained its officers that if they are restraining a person experiencing excited delirium, "they will actually reduce the risk of death to the person". Tr. at 1266.

- Inspector Blackwell personally approved the excited delirium PowerPoint (Thao Ex. T-12). Tr. at 1273.

- Then-Chief Arradondo previewed and made sure the PowerPoint included "his vision" in the training. Tr. at 1273.

The PowerPoint was shown in its entirety with both video and audio, paying special attention to the comment sections on the PowerPoint, which were read to the officers during training. The PowerPoint contains graphic and violent images and videos of police officers tackling, using force, and restraining persons thought to be experiencing excited delirium. Thao Ex. T-12. MPD used these images and videos to train their officers that officers were authorized to and encouraged to use physical restraint to hold a person suspected of being in the throws of excited delirium in the prone position until medical personnel arrived and made a decision about sedation. MPD repeatedly trained officers – including Thao – with this PowerPoint. *See generally* Tr. Volume XVI and Volume XVII (Testimony of Tou Thao).

Slide 31 shows a training officer with his knee on the neck of a person restrained in handcuffs in the prone position. Thao Ex. T-12 at Slide 31. Other officers look on and also aid in holding down the man. *Id.*

A comparison of the restraint depicted in the photograph used to train officers on excited delirium with the restraint of Floyd by Officer Chauvin demonstrates the technique he used placing his knee on Floyd's neck was exactly what MPD trained its officers to do.

Slide 32 of the PowerPoint teaches officers to assist in controlling the suspect "for you, your partner and EMS safety on scene." Thao Ex. T-12 at Slide 32.

The PowerPoint disclosed by MPD contains videos. Some of the videos disclosed were titled "Slide 19 - excited delirium guy punches through a wall", "Slide 24 – Naked Indiana Zombie Attacks 3 cops 'Ninja Style', Escapes After Being Continuously Tasered" and "Slide 26 – Graphic Video Police officers shoot naked man with Taser…Narcotics.Excited delirium". *See* Thao Ex. T-12 at Slide 16; Tr. at 1241 (Inspector Blackwell testifying that NOTACRIME is "an acronym that was used to put out the symptoms of or behaviors that someone with excited delirium would display."). MPD used the mnemonic NOTACRIME to help officers identify the signs that a person may be experiencing excited delirium. Thao Ex. T-12. The letters stand for:

- "N: Patient is **naked** and sweating". Thao Ex. T-12 at Slide 18;

- "O: Patient exhibits violence against **objects**". *Id.* at Slide 20;

- "T: Patient is **tough** and unstoppable". *Id.* at Slide 22;

- "A: Onset is **acute**". *Id.* at Slide 23;

- "C: Patient is **confused**". *Id.* at Slide 25;

- "R: Patient is **resistant**". *Id.* at Slide 27;

- "I: Patient's speech is **incoherent**". *Id.* at Slide 28;

- "M: Patient exhibits **mental** health". *Id.* at Slide 29; and

- "E: EMS should be requested **early**". *Id.* at Slide 30.

The MPD trained its officers to do exactly what was done to Floyd. They trained their officers that restraint until EMS arrived was authorized, approved, and encouraged to save the lives of the ExD person.

Thao had previous experience with a MPD officer dealing with a person suspected of having excited delirium. Thao testified about a call he responded to in the Third Precinct where a person had crashed a car into a snow bank. Tr. at 3142. Fire, police, and EMS arrived on scene and the paramedics and firefighters got the driver out of the driver's seat. *Id.* at 3143. The driver was unconscious. *Id.* at 3142. The unconscious driver was loaded into the ambulance. *Id.* at 3143. "We're kind of just talking with the paramedics, and next thing we know this guy jumps out of the gurney and we're now fighting him and restraining him, trying to re-restrain him onto the bed." *Id* at 3143-44. It took two paramedics and two officers and sedation to re-restrain the driver. *Id.* at 3144.

## 2. Offense conduct

On May 25, 2020, Thao and Chauvin were partnered together and assigned to Squad 330 at the Third Precinct for the middle watch shift. Tr. at 3109; 3112. At the time of the call, they were ready to eat dinner at the Third Precinct. *Id.* at 3110. Thao and Chauvin were dispatched to an "out of sector" forgery call at Cup Foods. *Id.* "Out of sector" calls are calls that occur outside of a police officer's assigned geographic sub-section within their precinct. *See generally* Tr. at 3110. Thao and Chauvin were specifically called because they were the only squad car available at the time of the call. Tr. at 3110-11. The

call was a "priority 1" call which means "get there fast. Suspect may still be on scene. The crime is still in progress." *Id.* at 3111. Dispatch provided information that the suspect was still on scene in a parked car and **possibly under the influence.** *Id.*

Squad 320 – Kueng & Lane's squad – cancelled Thao and Chauvin responding and instead took the call. *See generally* Tr. at 3112. Shortly thereafter, squad 320 "stated that they're taking one out of a SUV, so dispatch immediately dispatched us to assist them." Tr. at 3112.

Before leaving the precinct, Thao and Chauvin received additional information: "we heard on the radio there's some – it seemed like there was a struggle or something, so it seemed like – I believe dispatch asked 320 what was their status. And that means to us usually, if there's a struggle going on, we increase, we go Code 3, lights and sirens." Tr. at 3113.

Chauvin and Thao left in their squad to respond to the call. Halfway through the drive to Cup Foods, "320 had called a Code 4, so we slowed down." *Id.* (Thao explaining further that code 4 means "scene okay"). Rather than turning around to go back to the station and resume their dinner, Chauvin and Thao continued to the call because "from [Thao's] experience, Cup Foods is hostile to police." *Id.* at 3114.  While driving to the incident location, Thao can be heard telling Chauvin that "we're going over there at least. It's kind of uh Blood's territory". Gov't Ex. 9 at 20:12:24-20:12:36. Thao testified that "It's a well-known Bloods gang hangout spot. And [Lane and Kueng] being new, I don't

think they would have known that." Tr. at 3114. Thao elaborated: "I wanted to at least provide 320 with security just in case things got out of hand, because it sounded like they were in a struggle near there, so I didn't know what potential environment they could be having there". *Id.* 3114-15. The Bloods street gang can be identified because they normally wear red. *Id.* at 3115.

Upon arriving on scene, Thao and Chauvin pull up to the left side of 38th street because Officer Chang "[w]as outnumbered two to one and one of them was wearing red" and "[h]e was by himself. So officer safety-wise it made sense to go to him" *Id.* at 3118 and 3119 respectively. Thao noted the entirely red outfit of a person as significant because it meant that "There may be gang members in the area." *Id.* at 3119. Officer Chang waived off Thao and Chauvin, so they proceeded to the north side of 38th street and parked near squad 320 where the struggle was ongoing. *See id.*

At 20:17:33, Thao and Chauvin arrived on the scene where Lane, Kueng, and Floyd struggled by squad 320. Gov't Ex. 9. At that time, Floyd was inside the squad car, physically resisting, and attempting to get out. Gov't Ex. 9. Thao observed Kueng and Lane struggling with Floyd to get him into their squad car. Tr. at 3121; Thao Ex. T-29. Thao observed Floyd physically resisting getting inside the squad vehicle. Thao testified that "there seems to be a lot of physical force to kind of try to get him inside" and Floyd was stiffening up his leg. Tr. at 3121. In his eight years of experience as an MPD officer, Thao had experience getting resisting persons into a squad vehicle, but had "never seen this much

of a struggle." *Id.*

While Floyd was inside of the squad car, he stated that he could not breathe. When Floyd said this, Thao did not observe anything that would have inhibited Floyd's ability to breathe. Tr. at 3122. Thao was familiar with arrestee's claiming they cannot breathe. *Id.* He testified that "[p]retty much after the New York incident, it was pretty regular that when you arrest people, they kept saying they can't breathe, they can't breathe, so it became a pretty regular occurrence." *Id.* (New York incident is later explained as the 2014 arrest of Eric Garner who said 'I can't breathe'). Gov't Ex. 9 at 20:18:06; Thao Ex. T-29. Thao continued to observe Kueng, Lane, and Chauvin's attempts to get Floyd into the car, while Floyd physically resisted. Gov't Ex. 9 at 20:18:06-20:19:04. At one point, Thao observed Floyd use his leg to "kind of launch himself out the other side of the door … where Lane was." Tr. at 3123. Floyd again said he cannot breathe. Gov't Ex. 9 at 20:18:35-42. Thao's BWC shows that Chauvin had his arm around Floyd's chest and his hands at the back of Floyd's neck while Floyd was still partially in the squad vehicle. *Id.* at 20:18:41.

At this time, Thao testified that he was thinking "It was obvious that he was under the influence of some sort of drugs." Tr. at 3125. Thao testified that he thought that because "[w]hen I first arrived, I saw kind of beads of sweat on him on his head, and he was kind of – very sweaty." *Id.* This observation was significant because "[i]t's a sign of potential drug use and a sign of excited delirium." *Id.* Thao also observed other signs that Floyd was under the influence:

> We did receive the initial information from the caller that he appeared to be under the influence. He was kind of incoherent, not listening to direction, not able – we weren't able to reason with him or even get him calmed down. He's fighting off three officers consistent with super-human strength or more strength than all three officers could handle.

Tr. at 3126. Of significance, was that Floyd displayed all these signs while handcuffed. *Id.*

Around 20:18:50, Thao said that they may have to hog-tie Floyd. Gov't Ex. 9 at 20:18-50-20:18:54; Tr. at 3128. Thao testified that when he said "tie", he was referring to using the hobble. Tr. at 3128. Thao suggested that they may have to tie Floyd "Because he's out of control. We can't control him. This may be a medical issue at this point, so we might have to put him on the ground and restrain him." *Id.* At this point, what Lane, Kueng, and Chauvin were doing was not working. *Id.* at 3129. Thao testified that "It's hard to put a big person who is not cooperating inside a squad car, so we kind of have to figure out a different solution." *Id.* After more than a minute passed of Lane, Kueng, and Chauvin unsuccessfully attempting to get Floyd back into the vehicle, Thao suggested to put him down on the ground, stating "Hey. Just take him out" and "Just lay him down." Gov't Ex. 9 at 20:19:00; Thao Ex. 29.

Floyd was laid down on the ground in the prone position, with Chauvin using his knee on the neck/head area of Floyd to control him during the restraint. Gov't Ex. 9 at 20:19:15

Thao testified that while on scene, he believed that Floyd may have been experiencing excited delirium. Tr. at 3138. Thao believed this based on his training and

experience, explaining: "[Floyd] was acting erratic. He was very sweaty, unable to respond to us, violent. He was able to fight off three officers trying to get him in the squad car." *Id.* Thao hoped that the officers would be able to restrain Floyd until EMS arrived, then the paramedics would do a medical evaluation and figure out the proper response. *Id.* at 3140. Based upon his knowledge of Minneapolis and the traffic, Thao expected that the ambulance would arrive within "probably five minutes" after being dispatched from Hennepin Healthcare (also referred to as "HCMC" at times) to the scene of 38th and Chicago. *Id.*

Thao immediately went to the back of the squad car and began to search for a hobble. *Id.*; Tr. at 3130. At 20:19:46 Lane radioed in Code 2 request for medical attention. Thao asked if EMS had been called, and Lane and Kueng confirm this. Gov't Ex. 9 at 20:20:25. Thao found and retrieved the hobble in Lane's duty bag and handed it to Chauvin. Tr. at 3130; Gov't Ex. 9 at 20:19:15-20:20:22. The decision was made not to use the hobble. *See also* Tr. at 3242 (testimony from Thao that it was a group decision to not use the hobble). Thao testified that at this point in time he was aware EMS was coming, and it would have impaired their work if Floyd was hobbled upon their arrival: "Essentially when they would arrive, we would have to undo the thing, which would delay medical attention." Tr. at 3133. Additionally, when a hobble is used, it is policy for a sergeant to be notified; a sergeant must arrive on scene and take photographs of the arrestee in the hobble to insure that the hobble was used correctly before the arrestee can be transported. *Id.* at 3134. Thao testified

that this would have further delayed medical attention: "[W]e would have to essentially tell the paramedics; Hold on. He's tied up. We have to wait for our sergeant to come to review the hobble before we can release him, which logically makes no sense because we're trying to get him medical attention, not tie him up." *Id.* Thao relayed this reasoning to the other officers. Gov't Ex. 9 at 20:20:29; 20:20:38.

At 20:20:56, Thao asked the other officers "Is he high on something" to which Lane responded with "I'm assuming so" and Kueng stated "I believe so. We found a pipe on him." Thao Ex. T-29; Gov't Ex. 9 at 20:20:56-20:21:02.

At 20:21:04, Floyd said he "ate too many drugs". Thao Ex. T-29, Gov't Ex. 9 at 20:21:04; Tr. at 3136-37 (Thao testified that "I heard him say he ate drugs"). Thao testified that "[i]t's not uncommon, from my experience, for people to eat drugs before cops show up." *Id.* at 3137. Thao testified that generally the motivation of a person trying to eat drugs would be to conceal the drugs or to avoid going through withdrawal in jail, rather than in a hospital setting *Id.* Thao had previous experience with someone eating drugs while he tried to detain them. *Id.*

At 20:21:48 Thao's BWC records Lane stating "He's gotta be on something". Gov't Ex. 9 at 20:21:48. Shortly after, Thao asked Floyd "What are you on?", but is given no response. Gov't Ex. 9 at 20:21:54. Lane told the other officers "We found a weed pipe on him. Might be something else with it, might be like PCP or something. Is that the the shaking of the eyes right – PCP?" *Id.* starting at 20:22:10; Thao Ex. T-29.

Later, one of the bystanders (unprompted) said "He's on crack right now. He's probably OD-ed". Gov't Ex. 9 at 20:26:39; Thao Ex. T-29.

At 20:20:48, Thao turned on the emergency lights on squad 320 which would "signify to paramedics that we're right here." Tr. at 3135.

At 20:21:14, Thao asked the other officers if EMS is coming on a Code 3 (as fast as they can), to which Lane says that EMS was called on Code 2 and they "could probably step it up". Thao Ex. T-29; Gov't Ex. 9. Thao immediately stepped up EMS to Code 3. Thao Ex. T-29; Gov't Ex. 9 at 20:21:16. Dispatch confirmed with a "copy". Gov't Ex. 9 at 20:21:28. Thao explained his reasoning for stepping up EMS:

> So after he had said he might have taken some drugs and we're suspecting -- **I'm suspecting excited delirium and I know that we're really running short on time,** it's -- so I'm asking Lane if we have EMS coming Code 3… Because we needed them there, like, right now.

Tr. at 3137-38 (emphasis added). "Because he's going through excited delirium. We're running out of time and we need him potentially sedated to save his life". *Id.* 3140-41.

After over five minutes passed since Thao originally called in Code 3, EMS had not yet arrived on scene. Gov't Ex. 9. Thao radioed dispatch again, and asked again for EMS to come to their location. *Id.* at 20:26:42. Dispatch told Thao that EMS is en route and within a minute, EMS arrived. *Id.* 20:26:42-20:27:26.

Thao did not participate in the restraint of Floyd. Instead, Thao took the role of crowd control "to allow [Chauvin, Kueng, and Lane] to attend to Mr. Floyd." Tr. at 3146. This

was in line with general police practices – Thao testified that a second squad arriving on scene is to act as a support unit. *Id.* at 3160. This is because the first officers who arrive on a scene are going to have the most information. *Id.*

At 20:20:48, Thao turned on the emergency lights on squad 320, "to signal the northbound lane that the police is there, so they don't crash into or hit the officers or Mr. Floyd, and then also the rear lights to signify to paramedics that we're right here." Tr. at 3135.

For the majority of the time Floyd was in the prone position on the ground, Thao was charged with crowd control. He positioned himself in the road as a sort of human traffic cone. *Id.* Thao testified on his reasoning for traffic control: "Most people when they're driving, they're focused on what's ahead of them, not really necessarily on the ground. So I put myself out in the traffic to – so they can see me and give distance to the officers." *Id.*

When a crowd began to gather, Thao took over crowd control because some bystanders started getting off the sidewalk towards the officers and Floyd and Thao "wanted to give the officers the spacing to do what they needed to do". *Id.* at 3145.

At some point a bystander – later identified as Genevieve Hanson – identified herself as a firefighter. Gov't Ex. 9 at 20:25:28. When she entered the scene, she did so by walking into Thao's blind spot, from behind. 20:25:28-20:25:34. Thao testified that she did not show him any identification to confirm this, and he did not believe she was a fire fighter

because "Generally speaking, most first responders don't just jump onto a scene and especially behind a police officer, come right behind a police officer. That's -- they should know that as first responders not to sneak up on another first responder like that." Tr. at 3146-47. Essentially, Hanson's behavior was inconsistent with the ways in which first responders are trained to safely interact with a scene, and thus Thao reasonably did not believe she was actually a firefighter at the time of the incident.

As time went on with the crowd, he heard them request the officers to perform medical checks on Floyd. Tr. at 3148. He did not perform the checks himself because he was dealing with crowd control. *Id.* Thao rightfully assumed that the other officers were monitoring Floyd as this was their role per training and policy. Thao told the crowd that EMS was coming as a way "[t]o reassure that we are taking care of him. We have medical professionals coming" and "Just to let them know that we're not trying to hurt him. We have medical coming. The professionals are coming to handle him." *Id.* at 3148-49; and 3153 respectively.

At several times, bystanders attempted to step off of the sidewalk and into the scene. *Id.* at 3152. Thao testified that he wanted people to stay on the sidewalk "to give paramedics and officers space to operate." *Id.* Keeping bystanders off of the street and on the sidewalk would prevent bystanders from "potentially attacking the officers or disrupting the medical attention that they were doing." *Id.* at 3153.

The role of crowd control limited Thao's direct focus to what was going on in front

of him, rather than the restraint and what was occurring behind him. For instance, he was unaware of when the ambulance left until Chauvin tapped him on his shoulder. Tr. at 3154. When asked by a bystander if Floyd had a pulse, Thao responded with "I'm busy trying to deal with you guys right now." Gov't Ex. 9 around 20:27:05; Tr. at 3329. Thao explained through testimony that he did not take steps to inquire whether Floyd had a pulse because he was preoccupied with his duty of crowd control. Tr. at 3330. Thao was depending on his fellow officers involved in the psychical restraint to monitor Floyd's health status, including checking his pulse and breathing.

i. **Evidence regarding Thao's willfulness**

Thao saw Chauvin use his knee on Floyd's neck. Tr. at 3141. Thao testified that it was not uncommon to observe that, and that the MPD trained on this technique. *Id.* Thao testified that he had seen previous instances of police officers in Minneapolis restraining people in part by putting their knees on a person's neck. *Id.* This technique did not seem unusual to Thao. *Id.*

Thao initially observed Floyd trying to get up from the prone position and "could see that [Floyd's] body hit Mr. Chauvin's knees, so that led me to believe that there's not being force initially." *Id.* at 3229.

Thao testified that he was unaware of what was happening with Floyd at all times due to his role in the crowd control. *See id.* at 3246 (where Thao testifies that although Chauvin and Floyd generally remained in the same position, he can't be certain whether

Chauvin kept his knee on Floyd's neck the entire time because "Obviously I wasn't watching him the entire time."); *see e.g.* at 3261 (Where Thao testifies that during the third minute of the restraint, he was not continuously watching Chauvin restrain Floyd). Thao also testified that his BWC is positioned lower than his eyes so at times his BWC may records things he did not personally see or entirely see because he was looking elsewhere. *E.g* Tr. at 3248 (where Thao testifies at around 20:20:41 of his BWC, he is watching the horizon while speaking to the officers while his BWC captures the three officers on top of Floyd (Gov't Ex. 9 at 20:20:41)).

Thao testified that he assumed the other officers were restraining Floyd "[b]ecause they were waiting for an ambulance to arrive." Tr. at 3145. Thao was trained in basic first aid. Tr. at 3145. Thao testified that the restraining officers would be expected to monitor Floyd's medical condition. *Id.* Thao testified that he assumed this is what the three restraining officers were doing – monitoring Floyd's medical condition. *Id.*

At no point did Thao observe the three officers roll Floyd over and do CPR on him. *Id.* at 3149. Thao testified that this was significant to him for the following reasons:

- The MPD trains officers to start CPR if a person has no pulse. *Id.* at 3149.

- If the other officers are not doing CPR, Thao assumed that Floyd is still breathing and doing fine. *Id.*

- By not seeing CPR performed at any time, it indicated to Thao that Floyd had a pulse. *Id.*

Thao testified that he was unaware of Floyd's medical status, and it wasn't until after the ambulance left, and the firefighters arrived that he first realized that something more serious may have happened. Tr. at 3154-55. "When the fire department arrived, and I was kind of confused why the fire department was coming and the paramedics were already gone probably three, four minutes ago. So I heard dispatcher said that they needed fire to go to 36th and Park to help with CPR." *Id.* at 3155. "I kind of connected the dots. It's like, oh, okay, so I guess this guy was in critical condition when they left." *Id.*

## B. Prosecutorial Remarks and Conduct

The prosecution repeatedly made improper and unprofessional remarks and conduct during the course of the trial. *See infra* below. The prosecution was doing so intentionally, as the same objections were repeatedly sustained by the Honorable Judge Magnuson, occasionally back-to-back. For example, the district sustained Mr. Paule's objection as to asked and answered and repetitive testimony. The district responded "I think we're getting completely repetitive, counsel. We've been over and over and over this." The Government continued and Mr. Paule objected with the same objection. The district court responded "Yeah, counsel, I think we've just gone over and over it. She just answered that very question". Tr. at 1365-1366.

It is notable that the government continued to flout the district rulings up to the very end of trial: the Government argued with the district court in front of the jury during closing arguments. *See* Tr. at 4133-34, and again at 4138-39.

The Government had four veteran attorneys on the lawsuit that engaged in a pattern of improper actions. As they were repeated again and again after admonishment, these actions cannot be considered nonintentional.

**1. Unfairly duplicative evidence and cumulative testimony**

    a. Tr. at 492 (where the district court cautioned the Government after a morning of testimony supplemented by multiple videos, "I am very concerned about the duplicate, repetitive information coming forward in the evidentiary side of this. Some of it, I think, is unavoidable. But I'm very concerned about that duplicate side");

    b. The prosecution had to be reminded time and time again to not go over the same testimony or exhibits during the examination of Commander Blackwell:

        i. Tr. at 888 (where the district court sustained and told the prosecution "We've gone over this, counsel.").

        ii. Tr. at 1032 (where the district court sustained for asked and answered and told the prosecution "We've gone over it.").

        iii. Tr. at 1053 (where the district court sustained the objection and told the prosecution "We just read it. We don't need to read it again.").

        iv. Tr. at 1069 (where the district court sustained for "asked and answered twice" and reminded the prosecution "It is. It is multiple. I sustain.").

v. Tr. at 1108-1109 (the district court heeded the government again, "There's going to come a time when video playing is jury becoming simply too repetitive and it ends up becoming prejudicial … I'm going to caution you that you need to be careful about how much video you play").

vi. Tr. at 1340 (where the district court sustained another objection for asked and answered during the prosecution's redirect of the witness. The district court again admonished the prosecution by saying "I sustain. We're going over the same territory, counsel.").

vii. Tr. at 1342:

MR. ROBERT PAULE: Your Honor, this has been asked and answered. I object.

THE COURT: It has, counsel, and I sustain.

MS. BELL: Your Honor, may we have a side bar?

THE COURT: No.

BY MS. BELL:
Q. I'm inquiring about questions Mr. Gray asked you about conscious neck restraints.

THE COURT: Counsel?

MS. BELL: Yes.

THE COURT: We have looked at this document and looked at this document. I think it speaks for itself, and I don't know why we're going back over the same territory.

viii.  Tr. at 1365 (where Mr. Paule objected and stated, "This is asked and answered and it is repetitive territory." The district court agreed, stating "I think we're getting completely repetitive, counsel. We've been over and over and over this.").

ix.  Tr. at 1365-66: (where Mr. Paule objected with "Your Honor, same objection." The district court agreed and told the prosecution "Yeah, counsel, I think we've just gone over and over it. She just answered that very question.").

c. *See also* Tr. at 488, 1689, 1707, 1905, 2696, 2706, 2722, 3252, 3577, 3578, 3587, 3690, 3693, 3697, 3698, 4031, and 4032.

## 2. Violations of pretrial orders

a. **For eliciting emotional responses.** *See* Tr. at 437, 480-482 (sidebar regarding objections concerning the prosecution's attempts to elicit emotional reaction out of witness McMillian), 484-487 (where Mr. Paule objected to the government violating the district court's pretrial ruling to not elicit emotional responses. "They're trying to say what was your emotional state when you said, you know, 'Let him breathe.' Why did you say that? Well, I mean, it's absolutely calculated to draw an emotional response.") and 747.

i. See Tr. at 553:

> [Scurry:] I grew concerned
>
> [Ms. Bell]: Why?
>
> MR. GRAY: Object to that, Your Honor.
>
> THE COURT: Sustained.

b. **For speculation.** The district court in its pretrial ruling granted a motion to prohibit a witness to testify as to what they would have done if they were involved in the incident in question. R. Doc. 195 at 3; Addendum at **7**. The government repeatedly violated this pretrial order. *See* Tr. at 508, 541, 543, 770 (where the prosecution asked off-duty firefighter/bystander Hansen "In your experience, if a pulse of someone was taken and not found, what would happen?" The objection was sustained). 1124, 1125 (where the prosecution asked a police officer who was not present at the incident "Could officers also asked for help for their - - from their fellow officers on scene if they were concerned about the crowd?" The objection for violating a pretrial ruling was sustained)., , 1709 (where the district court sustained an objection to the prosecution's question "And given that timeline you just discussed, in your professional opinion and to a reasonable degree of medical certainty, who, if anyone, had the last chance to save Mr. Floyd's life?"), 1859, 2060, 2062, 2141, 2152, 2155, 2595,

2599, 2602, 3206, 3216, 3548, 3259, 3297, 3308, 3326, 3327, 3332, 3334, 3566, 3578, 3580, 3589, 3593, 3596, 3601, and 3603.

**3. Inappropriate arguments**

    **a. Argumentative opening** *See* Tr. at 219, 222, and 225.

    **b. Argumentative with Defendant Thao** *See* Tr. at 3206, 3217, 3218, 3228, 3244, 3249, 3257 (where the district court stated "Counsel, you're getting argumentative over and over again"), 3259, and 3262.

    **c. Improper Closing**

        i. *Confrontation clause violation*. *See* Tr. at 3983.

        ii. *Burden shifting. See* Tr. at 3988, 3990, 3992, 4003, and 4008

        iii. *Disparaging the defense. See* Tr. at 3988, 4022, 4024, 4025, 4027, 4129, 4133, and 4135

        iv. *Misstated the evidence*. *See* Tr. at 3976, 3982, 3989, 4000, 4025, 4129, 4131, 4133, and 4134.

        v. *Calling on the morals or emotions of the jury. See* Tr. at 3975, 3976, and 4142 (where the Government told the jury "evil happens when good men do nothing. This happened in part because these three defendants did nothing").

        vi. *Violating* <u>*Graham v. Connor's*</u> *stance against 20/20 hindsight*. *See* Tr. at 3986. *Graham v. Connor,* 490 U.S. 386 (1989).

29

vii. *Vouching for the truthfulness or untruthfulness of the defendants.*

    *See* Tr. at 3991, 4025, 4026, and 4027.

**d. Unprofessional remarks in front of the jury.**

  i. *See* Tr. at 3228:

THE COURT: Counsel, you are being argumentative at that point.

MS. BELL: I guess we have different definitions of "escape", but I will try to ask the question broader.

MR. PAULE: Objections. That's obligatory [sic]. She's just adding comments for the record. That's inappropriate.

  ii. *See* Tr. at 3234 (where the district court admonished the Government at sidebar, stating "counsel, it's highly prejudicial and highly wrong to have these arguments in fronts of the jury").

## Standard of Review

Sufficiency of evidence is reviewed *de novo. United States v. Sullivan,* 714 F.3d 1104, 1107 (8th Cir.2013). "We view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." *Id.* (citations and internal quotation marks omitted). "We will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Wells,* 706 F.3d 908, 914 (8th Cir.2013)).

On appeal, "[w]e will reverse for prosecutorial misconduct only if the conduct, even if improper, so prejudiced [the defendant] that he was unable to obtain a fair trial." *United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011)(citing to *Carlson v. Minnesota,* 945 F.2d 1026, 1029 (8th Cir.1991)). "The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir.1985).

# SUMMARY OF ARGUMENT

## I. Thao's Conviction Should Be Overturned Because of Insufficiency of Evidence.

When viewing the trial court evidence in the light most favorable to the guilty verdict – granting all reasonable inferences that are supported by that evidence – no reasonable jury could have found Thao guilty beyond a reasonable doubt. Specifically, there is substantial evidence showing that Thao did not act with willful indifference, but instead actively, intentionally, and repeatedly attempted to get Floyd medical attention quickly. Even when viewing the evidence in the light most favorable to a guilty verdict, no reasonable jury could have found that Thao had the requisite *mens rea* and thus the conviction should be overturned.

## II. Thao's Conviction Should be Overturned Because of Prosecutorial Misconduct.

Throughout testimony, opening and closing statements, the prosecution repeatedly and intentionally made improper comments. The improper comments and conduct were consistently objected to, consistently sustained, and the district court repeatedly admonished the government for their improper courses of conduct. The improper comments were cumulative and in front of the jury, the government presented a weak case of guilt, and the curative actions by the district court did not stop the government's course of conduct which infiltrated the jury's deliberations. The prosecution's improper conduct substantially affected Thao's rights and thus the conviction should be overturned.

**ARGUMENT**

## I.    Thao's Conviction Should Be Overturned Because of Insufficiency of Evidence.

### A. Standard of Review

Sufficiency of evidence is reviewed *de novo. United States v. Sullivan,* 714 F.3d 1104, 1107 (8th Cir.2013). "We view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." *Id.* (citations and internal quotation marks omitted). "We will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Wells,* 706 F.3d 908, 914 (8th Cir.2013)).

### B. Viewing the evidence in the light most favorable to the guilty verdict, no reasonable jury could have found Thao guilty beyond a reasonable doubt.

#### a.  There is an insufficiency of evidence as to the requisite *mens rea.*

The Honorable Judge Magnuson analyzed the issue of sufficiency of the evidence in his Memorandum and Order filed on May 10, 2022. R. Doc. 334; Addendum p. 17. In it, the district court found that "There was substantial evidence in this case that could have led the jury to determine that Defendants did not act willfully." R. Doc. 334 at page 3; Addendum p. 19:

> For example, Defendant Thao notes that he increased the urgency of the ambulance call by "stepping up" the code from a 2 to a 3, and Officer  Mackenzie testified that Thao could have assumed that Mr. Floyd was not in cardiac arrest  from the fact that the other officers were not performing CPR. Thao also points out that he did not touch Mr. Floyd and was not involved in the

33

restraint in any way, but rather performed crowd- and traffic-control duties during the incident.

Additionally, the Honorable Judge Magnuson had further concerns with the sufficiency of evidence and the verdict, stating "The jury's decision was undoubtedly a difficult one, and **the Government's evidence was not overwhelming**" and "the Court has grave concerns about the possibility that the jury's verdicts were based on their fear of repercussions – social, political, and personal – from a different outcome". R. Doc. 334 at pages 4 (emphasis added) and 5; Addendum 20-21.

The Government's witnesses in this case support the notion that Thao did not willfully fail to intervene. For instance, Government witness Nicole Mackenzie testified to the following:

- Thao suggested a hobble before Floyd was placed on the ground. *See* Gov't Ex. 009A at 20:18:38 and 20:18:51.

- Thao got the hobble (also referred to as a "MRT") out of the squad car and brought it over to the other officers to allow them to use it. Tr. at 2068 (testimony of Nicole Mackenzie)

- Mackenzie testified that Chauvin rebuffed Thao's suggestion of the hobble, and that but for Chauvin, Thao would have used the hobble. *Id.*

- If the hobble had been used, Floyd would have been in the recovery position. *Id.* at 2030.

- Thao asked if EMS had been called. *Id.* at 2068.

- Upon finding out that EMS was called at a Code 2, Thao radioed in for EMS to come Code 3 – which is the fastest way for an ambulance to get to the scene. *Id.*

- It would be the expectation that if Floyd was in cardiac arrest, the other officer would have been doing CPR. *Id.* at 2070.

- Since the officers were not doing CPR, Mackenzie testified that it would be the logical assumption that Floyd was not going into cardiac arrest. *Id.*

Additionally, the record supports the following:

- Thao believed Floyd was experiencing excited delirium. Tr. at 3125; 3137-38.

- It was reasonable the Thao believed Floyd was experiencing excited delirium, as two other officers and a paramedic suspected the same. Tr. at 3465 and 3495 (where Kueng testified that Floyd could be suffering from excited delirium based on his observations on scene); Gov't Ex. 005 at 20:23:53 (where Lane is captured on body worn camera saying "I just worry about the excited delirium."); Tr. at 633-634 (where paramedic Smith testified that going into the call be though excited delirium was a possibility).

- Thao followed the MPD training on excited delirium. Tr. at 3137-38; 3140-41.

- MPD trained its officers and Thao that excited delirium patients can work themselves to death if they are not restrained and then sedated by EMS.

- Thao assumed the other MPD officers were restraining Floyd "[b]ecause they were

waiting for an ambulance to arrive." Tr. at 3145. The other officers told Thao they were holding Floyd until EMS arrived. Gov't Ex. 009 at 20:20:23-20:20:35.

- Thao turned on Squad 320's emergency lights to signify where paramedics should go. Tr. at 3135.

- Thao asked the other officers if they had called EMS right after Floyd was placed on the ground. Gov't Ex. 9 at 20:21:14.

- When Lane informed Thao that EMS had been called, but only as a Code 2, Thao immediately called dispatch to escalate the call to a Code 3 to get EMS on scene as fast as possible. Gov't Ex. 9 starting at 20:21:16. Tr. at 3137-3138.

- Thao testified that he wanted EMS on scene as fast as possible to "potentially sedate to save [Floyd's] life." Tr. at 3140-41.

- When the ambulance had not arrived on scene within 5 minutes – the time Thao estimated it would take them to get there from HCMC – he took it upon himself radio dispatch again to get an update. Gov't 9 at 20:26:42.

- At no point did Thao observe the three officers restraining Floyd roll Floyd over and perform CPR. Tr. at 3149. Thao testified that this was significant for the following reasons:

  o The MPD trains officers to start CPR if a person has no pulse. *Id*. at 3149.

  o If the other officers are not doing CPR, Thao reasonably assumed that Floyd was still breathing and doing fine. *Id*.

- By not seeing CPR performed at any time, it indicated to Thao that Floyd had a pulse. *Id*.

The evidence presented, including the government's own exhibits and witness testimony, shows that Thao intended to get Floyd medical attention as fast as possible. Thao made intentional efforts, not for a bad/improper purpose, but for the purpose of following MPD training and to get Floyd medical services promptly.

## II. Thao's Conviction Should be Overturned Because of Prosecutorial Misconduct.

### A. **Standard of Review**

On appeal, "[w]e will reverse for prosecutorial misconduct only if the conduct, even if improper, so prejudiced [the defendant] that he was unable to obtain a fair trial." *United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011)(citing to *Carlson v. Minnesota,* 945 F.2d 1026, 1029 (8th Cir.1991)). "The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir.1985).

### B. **The prosecution's remarks and conduct were improper.**

The prosecution repeatedly made improper remarks and conduct. As the prosecution was comprised of some of the most seasoned attorneys from the federal government and the improper remarks were repeatedly sustained, they were intentional and cannot be mistakes.

For instance, the prosecution repeatedly tried to play portions of the video of the incident after they had been played countless times to the jury. Mr. Paule objected as cumulative and prejudicial. Tr. at 3233. The district court agreed with the objection and admonished the prosecution, stating "counsel, it's highly prejudicial and highly wrong to have these arguments in fronts of the jury". Tr. at 3234.

The prosecution violated the rules of evidence by eliciting testimony on the ultimate legal questions. *See* Tr. 747 (where the district court sustained the objection).

The prosecution elicited testimony that violated the district court's pretrial rulings. *See* Tr. 1124-1125 (where the district court sustained the objection on the basis of violating pretrial ruling).

The prosecution repeatedly went over the same evidence and the district court had to step in to keep them on track. For instance:

> [Bell]: What is meant by applying light to moderate pressure?
>
> MR. ROBERT PAULE: Your Honor, this has been asked and answered. I object.
>
> THE COURT: It has, counsel, and I sustain.
>
> MS. BELL: Your Honor, may we have a sidebar?
> THE COURT: No.
>
> BY MS. BELL:
> Q. I'm inquiring about questions Mr. Gray asked you about conscious neck restraints.
>
> THE COURT: Counsel?

MS. BELL: Yes.

THE COURT: We have looked at this document and looked at this document. I think it speaks for itself, and I don't know why we're going back over that same territory.

Tr. at 1342.

The prosecution repeatedly and intentionally made improper statements and allegations during the closing argument that were objected to and the district court sustained the objections:

- Tr. at 3974 – where Thao objected to the prosecution "using a nontestifying witness to testify and drawing on the jury's emotions by consistently referring to a nine-year-old child." The district court sustained.

- Tr. at 3983 – where Thao objected to the prosecution reading statements that violated the confrontation clause of the U.S. Constitution. The district court sustained the objection.

- Tr. 3988 – where defense objected to the prosecution burden shifting. The district court sustained the objection.

- Tr. at 3990 – where Thao objects to the prosecution violating a pretrial order and burden shifting. The district court sustained the objections. Thao asked that the record by noted for "prosecutorial misconduct repeatedly during the closing argument." The court noted.

- Tr. at 4003 – where defense objects to the prosecution burden shifting. The district

court sustained the objection.

- Tr. at 4003 – where Thao objects to the prosecution burden shifting and repeatedly referring to a juvenile witness who did not testify. The district court sustained the objection.

- Tr. at 4023 – where the defense objected to improper argument. The district court sustained the objection.

- Tr. at 4025 – where Thao objects to the prosecution misstating the evidence. The district court sustained the objection.

- Tr. at 4025 – where the prosecution improperly calls out Thao after stating "speaking of lying".

- Tr. at 4031 – where Thao objected to as repetitious. The district court sustained. Immediately after being sustained, the prosecution continued to state the same argument. The prosecution was again objected to and the court sustained. Tr. at 4031-32. The prosecution again tried to continue the same argument. The district court *sua sponte* told them to move on, stating "It is repetitious". Tr. at 4032.

The prosecution also conducted themselves in a way that was highly improper and unprofessional. For instance, Lane's attorney told the court "Every question [the prosecutor] asks, she shakes her head yes when she wants a yes. I'm not sure it's maybe not intentional, but I don't want to object to that in front of the jury. But she's going like this (indicating) for a yes, and that's totally improper." Tr. at 734.

Prosecutors intentionally and repeatedly violated the Rule of Evidence and the United States Constitution. They repeatedly brought in arguments and touched on evidence that was improper and unprofessional.

The district court agreed that the prosecution tactics at trial were improper, but did not find that the improper remarks met the "high bar necessary for a mistrial on the basis of prosecutorial misconduct." R. Doc. 334 at page 9; Addendum at 25. The Honorable Judge Magnuson found that the prosecution's trial strategy "often seemed vindictive and overbearing." *Id.* Likening this case to former totalitarian states where the "rule of law suffers because of the disproportionate power of the prosecutor", Honorable Judge Magnuson wrote that "The Court view's the Government's conduct in this case – not the least of which was assigning no fewer than seven prosecutors to try the case – as frighteningly close to that line of overzealous prosecution." R. Doc 344 at 9-10; Addendum at 25-26.

C. **The prosecution's improper remarks and conduct prejudicially affected Thao's substantial rights so as to deprive him of a fair trial.**

The three factors used to determine the prejudicial effect of the prosecutorial misconduct are: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court." *United States v. Hernandez,* 779 F.2d 456, 460 (8th Cir. 1985); *see also United States v. Eldridge,* 984 F.2d 943, 946-47 (8th Cir. 1993).

The first factor is met in this case. Here, the prosecutor's improper comments were

not limited to one phase of trial. The misconduct permeated multiple witnesses – including the Government's direct examination of their witnesses and the cross-examination of defense witnesses – and closing arguments. The 8th Circuit has found that the first factor has been met where the prosecution's improper remarks occurring in multiple phases of a trial. *United States v. Conrad,* 320 F.3d 851, 855 (8th Cir. 2003).

This Court has reversed verdicts where the prosecution has repeatedly commented to the jury and elicited testimony about a manner the court had specifically prohibited prosecutors from mentioning. *United States v. Conrad,* 320 F.3d 851, 853-56 (8th Cir. 2003). The same happened here. *See also Berger v. United States,* 295 U.S. 78,79, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)( "[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.").

The second factor is met. The district court noted that the government's case "was not overwhelming." R. Doc. 334 at 4, Addendum at 20. This district court found that "There was substantial evidence in this case that could have led the jury to determine that Defendants did not act willfully." R. Doc. 334 at page 3; *see also factual basis supra and argument regarding sufficiency of evidence infra; see also United States v. Norton,* 639 F.2d 427, 429 (8th Cir. 1981)(where this Court found that the evidence against the defendant was not overwhelming and "Our review of the record compels us to conclude

that the jury verdict could reasonably have been affected by the improper argument.")(citing to *United States v. King,* 616 F.2d 1034, 1040 (8th Cir.), cert. denied, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980)).

The third factor is met. The district court had to repeatedly sustain objections against the prosecution's improper remarks. The district court made several attempts to quell the prosecution's pattern of intentional improper questioning, and its closing argument, but the prosecutors routinely ignored the judge's orders and continued the same improper conduct, only to have the judge sua sponte order them again to stop. The arguments and improper conduct were done repeatedly in front of the jury. The district court attempted to stop the improper behavior, but ultimately it was unable to cure the issue.

All three factors are met and show that the prosecution's improper arguments, questioning, and conduct prejudicially affected Thao's substantial rights and worked to deprive him of a fair trial. *See Conrad*, 320 F.3d 851 at 857. The proper remedy is to reverse Thao's conviction and remand for a new trial. *Id.*

## CONCLUSION

This Court should vacate Thao's conviction and sentence.


Respectfully Submitted,


Dated: February 16, 2023

*/s/ Robert M. Paule*
Robert M. Paule (#203877)
Robert M. Paule, P.A.
920 Second Avenue South
Suite 975
Minneapolis, MN 55402
T: (612) 332-1733
F: (612) 332-9951

Natalie R. Paule
Paule Law P.L.L.C.
101 East Fifth Street
Suite 1500
St. Paul, MN 551010
(T): 612/440-3404
nrp@paulelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2023, I electronically filed Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Eight Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully Submitted,

Dated: February 16, 2023 *_/s/ Robert M. Paule_*
Robert M. Paule (#203877)
Robert M. Paule, P.A.
920 Second Avenue South
Suite 975
Minneapolis, MN 55402
T: (612) 332-1733
F: (612) 332-9951

Natalie R. Paule
Paule Law P.L.L.C.
101 East Fifth Street
Suite 1500
St. Paul, MN 551010
(T): 612/440-3404
nrp@paulelaw.com

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel for Thao certifies that this Opening Brief complies with the requirements of Fed. R. App. P. 32(a)(7) in that it is printed in 14-point, proportionally-spaced typeface utilizing Microsoft Word: Version 2301, and it contains 10,718 words, including headings, footnotes, and quotations.

Respectfully Submitted,

Dated: February 16, 2023

*/s/ Robert M. Paule*
Robert M. Paule (#203877)
Robert M. Paule, P.A.
920 Second Avenue South
Suite 975
Minneapolis, MN 55402
T: (612) 332-1733
F: (612) 332-9951

Natalie R. Paule
Paule Law P.L.L.C.
101 East Fifth Street
Suite 1500
St. Paul, MN 551010
(T): 612/440-3404
nrp@paulelaw.com

**CERTIFICATE OF VIRUS CHECK**

The undersigned counsel for Thao certifies under the 8th Cir. R. 28A(h)(2) that this

Opening Brief and Addendum have been scanned for computer viruses and are virus free.

Respectfully Submitted,

Dated: February 16, 2023                    */s/ Robert M. Paule*
                                            Robert M. Paule (#203877)
                                            Robert M. Paule, P.A.
                                            920 Second Avenue South
                                            Suite 975
                                            Minneapolis, MN 55402
                                            T: (612) 332-1733
                                            F: (612) 332-9951

                                            Natalie R. Paule
                                            Paule Law P.L.L.C.
                                            101 East Fifth Street
                                            Suite 1500
                                            St. Paul, MN 551010
                                            (T): 612/440-3404
                                            nrp@paulelaw.com